UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


RICHARD COURTEMANCHE,

    Plaintiff,                                       Hon. Janet T. Neff

v.                                                            Case No. 1:12-CV-841

RICHARD CZOP, et al.,

    Defendants.
_____/


## REPORT AND RECOMMENDATION

This matter is before the Court on Defendants Corizon Health and Richard Czop's Motion for Summary Judgment, (dkt. #57); Defendant Pandya's Motion for Summary Judgment, (dkt. #60); and Plaintiff's Motion for Summary Judgment, (dkt. #67). Pursuant to 28 U.S.C. § 636(b)(1)(B), the undersigned recommends that Defendants' motions be **granted**, Plaintiff's motion be **denied**, and this action **terminated**.


## BACKGROUND

The following allegations are contained in Plaintiff's complaint. (Dkt. #1). In January 2005, Plaintiff began experiencing "seizures. . .frequent motor tics. . .and spontaneous vocalizations." In 2006-2007, after being examined by several physicians and undergoing an EEG examination, Plaintiff was diagnosed with "complex partial seizures, a generalized seizure disorder, and i.e., epilepsy." Plaintiff was subsequently prescribed a combination of Depakote and Neurontin which "reasonably

controlled" his seizures. In 2009, Plaintiff twice participated in EEG examinations the results of which were "inconclusive."

On September 20, 2011, Plaintiff was examined by Dr. Richard Czop who informed Plaintiff that he would renew his prescription for Neurontin. The following day, however, Dr. Czop, "without [first] consulting the Neurologist or performing any neurological tests," made the determination to "discontinue" Plaintiff's prescriptions for Depakote and Neurontin. This decision was approved by Dr. Haresh Pandya.

On October 26, 2011, Plaintiff was examined by Dr. Choi who ruled out the possibility that Plaintiff was suffering from a psychosis or Tourette's syndrome. Dr. Czop, however, disagreed, insisting that Plaintiff's condition was behavioral in nature and that no further tests were necessary. Moreover, Dr. Czop reiterated his decision to discontinue Plaintiff's Neorontin prescription despite the fact that this medication was effective in treating Plaintiff's condition.

On November 2, 2011, Plaintiff was "interview[ed]" by Dr. Berkman who "didn't seem to have any problem with the diagnosis of epilepsy or the treatment with Neurontin and Depakote that had been prescribed." Dr. Czop "argued against" treating Plaintiff with these medications, "insist[ing]" that Plaintiff was not suffering from epilepsy. On several occasions thereafter, Plaintiff reported to Dr. Czop that his "seizure activity had been greatly increasing." Dr. Czop nevertheless refused Plaintiff's requests to again be prescribed Neurontin.

Plaintiff later informed Dr. Pandya that his "seizure activity had greatly increased since the medication Neurontin had been discontinued." Despite such knowledge, Dr. Pandya "did not take any steps to reinstate Plaintiff's medication, provide an alternative medication, relieve or minimize the increased seizure activity, or instruct his subordinate, Dr. Czop, to take any of these steps."

Prison Health Services and Corizon, Inc. have each "enacted, implemented, and put into action a verbal or written policy, practice, custom, or procedure of denying or terminating needed medications to prisoners with chronic illnesses, including the Plaintiff, without any apparent medical justification and evidently for the purpose of saving costs, maximizing profits, or other non-medical reasons."

Plaintiff initiated the present action on August 14, 2012, against the Michigan Department of Corrections (MDOC), Prison Health Services, Inc., Corizon, Inc., Dr. Czop, and Dr. Pandya. Plaintiff asserts that Defendants' actions violated his Eighth Amendment rights. Plaintiff's claims against the MDOC were subsequently dismissed. Defendants Corizon,[1] Czop, and Pandya now move for summary judgment. Plaintiff likewise moves for summary judgment.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment "shall" be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment can satisfy its burden by demonstrating "that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case." *Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005); *see also*, *Amini v. Oberlin College*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The fact that the evidence may be controlled or possessed by the moving party does not change the non-moving party's burden "to show sufficient evidence from which a jury could reasonably

---

[1] Defendants Corizon, Inc. and Prison Health Services, Inc. refer to the same entity. (Dkt. #10). Prison Health Services has since been renamed Corizon. *Id.*

find in her favor, again, so long as she has had a full opportunity to conduct discovery." *Minadeo*, 398 F.3d at 761 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986)).

Once the moving party demonstrates that "there is an absence of evidence to support the nonmoving party's case," the non-moving party "must identify specific facts that can be established by admissible evidence, which demonstrate a genuine issue for trial." *Amini*, 440 F.3d at 357 (citing *Anderson*, 477 U.S. at 247-48; *Celotex Corp. v. Catrett*, 477 U.S. at 324). While the Court must view the evidence in the light most favorable to the non-moving party, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini*, 440 F.3d at 357. The existence of a mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734-35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). The non-moving party "may not rest upon [his] mere allegations," but must instead present "significant probative evidence" establishing that "there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 813-14 (6th Cir. 2006) (citations omitted).

Moreover, the non-moving party cannot defeat a properly supported motion for summary judgment by "simply arguing that it relies solely or in part upon credibility determinations." *Fogerty v. MGM Group Holdings Corp., Inc.*, 379 F.3d 348, 353 (6th Cir. 2004). Rather, the non-moving party "must be able to point to some facts which may or will entitle him to judgment, or refute the proof of the moving party in some material portion, and. . .may not merely recite the incantation, 'Credibility,' and have a trial on the hope that a jury may disbelieve factually uncontested proof." *Id.* at 353-54. In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Daniels*, 396 F.3d at 735.

While a moving party without the burden of proof need only show that the opponent cannot sustain his burden at trial, *see Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 787 (6th Cir. 2000); *Minadeo*, 398 F.3d at 761, a moving party with the burden of proof faces a "substantially higher hurdle." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002); *Cockrel v. Shelby County Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001). "Where the moving party has the burden -- the plaintiff on a claim for relief or the defendant on an affirmative defense -- his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. SCHWARZER, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487-88 (1984)). The Sixth Circuit has repeatedly emphasized that the party with the burden of proof "must show the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett*, 281 F.3d at 561 (quoting 11 JAMES WILLIAM MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 56.13[1], at 56-138 (3d ed. 2000); *Cockrel*, 270 F.2d at 1056 (same). Accordingly, summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

## EIGHTH AMENDMENT STANDARD

The Eighth Amendment's prohibition against cruel and unusual punishment applies not only to punishment imposed by the state, but also to deprivations which occur during imprisonment and are not part of the sentence imposed. *See Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Estelle v. Gamble*, 429 U.S. 97, 101-02 (1976). Accordingly, the Eighth Amendment protects against the

unnecessary and wanton infliction of pain, the existence of which is evidenced by the "deliberate indifference" to an inmate's "serious medical needs." *Estelle*, 429 U.S. at 104-06; *Napier v. Madison County, Kentucky*, 238 F.3d 739, 742 (6th Cir. 2001). The analysis by which a defendant's conduct is evaluated consists of two-steps. First, the Court must determine, objectively, whether the alleged deprivation was sufficiently serious. A "serious medical need," sufficient to implicate the Eighth Amendment, is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008). If the objective test is met, the Court must then determine whether the defendant possessed a sufficiently culpable state of mind:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* at 837.

In other words, the plaintiff "must present evidence from which a trier of fact could conclude 'that the official was subjectively aware of the risk' and 'disregard[ed] that risk by failing to take reasonable measures to abate it." *Greene v. Bowles*, 361 F.3d 290, 294 (6th Cir. 2004) (citing *Farmer*, 511 U.S. at 829, 847).

To the extent, however, that a prisoner simply disagrees with the treatment he received, or asserts that he received negligent care, the defendant is entitled to summary judgment. *See Williams v. Mehra*, 186 F.3d 685, 691 (6th Cir. 1999) (citing *Estelle*, 429 U.S. at 105-06) ("[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Brown v. Kashyap*, 2000 WL 1679462 at *1 (6th Cir., Nov. 1, 2000) (citing *Estelle*, 429 U.S. at 106) ("allegations of

medical malpractice or negligent diagnosis and treatment" do not implicate the Eighth Amendment); *Mingus v. Butler*, 591 F.3d 474, 480 (6th Cir. 2010) (to prevail on an Eighth Amendment denial of medical treatment claim, "the inmate must show more than negligence or the misdiagnosis of an ailment"); *Robbins v. Black*, 351 Fed. Appx. 58, 62 (6th Cir., Nov. 3, 2009) ("mere negligence or malpractice is insufficient to establish an Eighth Amendment violation").

**MEDICAL EVIDENCE**

The parties have submitted significant portions of Plaintiff's medical records.[2] (Dkt. #59; Dkt. #61, Exhibits 1, 4; Dkt. #68, Exhibits 1-2). Defendants Czop and Pandya have also submitted affidavits. (Dkt. #57 Exhibit A; Dkt. #61, Exhibit 1). This evidence reveals the following.

On August 16, 2006, Plaintiff reported that he was experiencing "frequent head/neck jerking, accompanied with extremities jerking and a barking - cat like noise." (Dkt. #68, Exhibit 101). Plaintiff was subsequently diagnosed with a tic disorder and prescribed Dilantin. (Dkt. #68, Exhibits 102-03).

On December 4, 2006, Plaintiff was examined by Dr. Umesh Verma. (Dkt. #68, Exhibit 104). Plaintiff reported that he "has a history of seizures" and was also experiencing "some vocalization and jerking of the neck." (Dkt. #68, Exhibit 104). The doctor observed that Plaintiff "has this neck jerking with some stridor-like sounds. . .[which] appear[] to be self-induced." (Dkt. #68, Exhibit 104). The doctor concluded that Plaintiff was experiencing psychologically-based "pseudoseizures." (Dkt. #68, Exhibit 104). The doctor switched Plaintiff from Dilantin to Depakote and scheduled him to

---

[2] Plaintiff, Dr. Czop, and Dr. Pandya have all submitted substantial portions of Plaintiff's medical records. These various submissions contain significant overlap. Rather than unnecessarily cite to multiple pleadings, the Court has instead cited to Plaintiff's submissions regarding his medical records unless a certain item of evidence is contained only in another pleading.

participate in an electroencephalogram (EEG) examination. (Dkt. #68, Exhibit 104). On February 9, 2007, Plaintiff participated in an EEG examination, the results of which were consistent with "generalized epilepsy." (Dkt. #68, Exhibits 105-06).

On April 2, 2007, Plaintiff reported that "ever since Depakote was started his jerking is less and his seizure frequency has improved." (Dkt. #68, Exhibit 106). On August 20, 2007, Plaintiff was examined by Dr. Verma. (Dkt. #59 at 298-99). Plaintiff reported that his seizures were "50-60% better," but his "vocalization and neck jerking" was "still about the same." (Dkt. #59 at 298-99). During the examination, Plaintiff exhibited vocalization and neck jerking which the doctor characterized as "voluntary" and "psychiatric in nature." (Dkt. #59 at 298-99). The doctor increased Plaintiff's Depakote dosage and also prescribed Neurontin. (Dkt. #59 at 298-99).

On April 7, 2008, Plaintiff was examined by Dr. Verma. (Dkt. #68, Exhibit 107). Plaintiff reported that since beginning Neurontin his "seizure frequency improved quit[e] a bit and he did not have any seizure for four months or so," but had lately experienced more "staring episodes." (Dkt. #68, Exhibit 107). The doctor noted that MRI and MRA examinations of Plaintiff's brain were "normal." (Dkt. #68, Exhibit 107). Plaintiff's Neurontin dosage was increased. (Dkt. #68, Exhibit 107). Treatment notes dated January 20, 2009, indicate that Plaintiff was experiencing "increased seizures." (Dkt. #68, Exhibit 111).

On February 18, 2009, Plaintiff participated in an EEG examination the results of which were "within normal limits" with "no clear epileptogenic activity, clinical or electrographic seizures encountered." (Dkt. #68, Exhibit 114). On March 19, 2009, Plaintiff participated in an EEG examination the results of which were "normal" with "[n]o focal lateralizing or epileptiform features." (Dkt. #68, Exhibit 116).

On October 13, 2009, Plaintiff was examined by Dr. Czop for the first time. (Dkt. #57, Exhibit A at ¶ 22; Dkt. #68, Exhibit 125). Prior to examining Plaintiff, Dr. Czop reviewed Plaintiff's "entire medical history with the MDOC and consulted several peer reviewed articles to evaluate [Plaintiff's] presentation." (Dkt. #57, Exhibit A at ¶ 22). Plaintiff reported that his symptoms "are stable right now," but that he "seems to develop a tolerance to meds." (Dkt. #57, Exhibit A at ¶ 22; Dkt. #68, Exhibit 125). Dr. Czop considered the possibility that Plaintiff's tics were the result of Tourette's Syndrome. (Dkt. #57, Exhibit A at ¶ 22; Dkt. #68, Exhibit 125). Believing that Haldol "may be effective for [Plaintiff's] tics if they arise from Tourette's Syndrome," Dr. Czop prescribed Haldol for Plaintiff. (Dkt. #57, Exhibit A at ¶ 22; Dkt. #68, Exhibits 125, 127). Dr. Czop also discussed with Dr. Edelman the possibility of having Plaintiff participate in a "three day video EEG" examination, but Dr. Edelman did not believe that such was warranted. (Dkt. #57, Exhibit A at ¶ 22; Dkt. #68, Exhibit 127).

On November 6, 2009, Plaintiff was examined by Dr. Czop. (Dkt. #68, Exhibit 129). Plaintiff reported that since beginning Haldol his twitches had "slow[ed] down," but his "cat-like utterances are more violent." (Dkt. #68, Exhibit 129). Plaintiff also reported that he "seems to become vegatitative (sic) more often." (Dkt. #68, Exhibit 129). The doctor continued Plaintiff's Haldol prescription, but noted that he would discontinue such if Plaintiff's symptoms worsened. (Dkt. #57 at ¶ 24; Dkt. #68, Exhibit 129). Plaintiff subsequently discontinued taking Haldol on his own initiative because it "seemed to be aggravating" his seizure activity. (Dkt. #68, Exhibit 131).

Treatment notes dated July 22, 2010, indicate that Plaintiff "is better with present medications" (Neurontin and Depakote) and has suffered only one seizure in the last six months. (Dkt. #59 at 833). Treatment notes dated November 22, 2010, indicate that Plaintiff's current medication regimen was "working pretty good." (Dkt. #59 at 840). Laboratory testing indicated that Plaintiff's

Neurontin level was "therapeutic," but that his Depakote level was "sup[er]therapeutic" which "can lead to significant side effects." (Dkt. #57, Exhibit A at ¶ 29; Dkt. #59 at 840).

On March 16, 2011, Plaintiff reported to the health care clinic complaining of "stumbling, walking to one side or the other when he walks somewhere." (Dkt. #68, Exhibit 135). Plaintiff also reported experiencing "shaking in his right hand/arm." (Dkt. #68, Exhibit 135). A nurse noted, however, that Plaintiff was "steady on [his] feet" when he walked into the clinic. (Dkt. #68, Exhibit 135). The nurse further observed that "no shaking of [Plaintiff's] right arm noted," but that "at different intervals [Plaintiff] would move [his] head to the side and let out a meow." (Dkt. #68, Exhibit 135). Treatment notes dated March 24, 2011, indicate that Plaintiff may be suffering from Neurontin toxicity. (Dkt. #68, Exhibit 136).

On April 5, 2011, Plaintiff was examined by Dr. Czop. (Dkt. #68, Exhibit 137). Plaintiff reported that he was experiencing "sea-sickness-like" symptoms. (Dkt. #68, Exhibit 137). Believing that Plaintiff's symptoms may have resulted from an elevated Depakote level, the doctor decided to decrease Plaintiff's Depakote dosage. (Dkt. #68, Exhibit 137).

On May 6, 2011, Plaintiff was examined by Dr. Czop. (Dkt. #68, Exhibit 139). Plaintiff reported that his neurological side effects had improved, but that he was experiencing an "increase in the seizure activity where he goes into a vegetative state." (Dkt. #68, Exhibit 139). Plaintiff reported that his "tics and vocalizations are about the same." (Dkt. #68, Exhibit 139). Dr. Czop characterized Plaintiff's symptoms as "bizarre" and that they "could be neurologic or psychiatric." (Dkt. #68, Exhibit 139).

Neurontin "is often abused within the prison system because it can provide a high to the patient." (Dkt. #57, Exhibit A at ¶ 34). Accordingly, authority to renew prescriptions for Neurontin

must be obtained from the Regional Medical Officer. (Dkt. #57, Exhibit A at ¶ 34; Dkt. #68, Exhibit 142). On September 21, 2011, Dr. Czop submitted a request to renew Plaintiff's Neurontin prescription, but further noted that "[a]fter rendering care [to Plaintiff] for nearly two years, I am convinced that his problem (tics, vocalizations, bizarre activities attributed to seizure) do not have a neurologic basis." (Dkt. #68, Exhibit 142). Dr. Czop recommended that Plaintiff be weaned from Neurontin and Depakote because such "were not helping these conditions." (Dkt. #57, Exhibit A at ¶ 34; Dkt. #68, Exhibit 142). The doctor further recommended that Plaintiff be observed "periodically" via video and, moreover, that Dr. Varma be consulted regarding Plaintiff's condition. (Dkt. #68, Exhibit 142). On September 23, 2011, Dr. Pandya, the Regional Medical Officer, agreed with Dr. Czop's recommendation to wean Plaintiff from Neurontin and Depakote. (Dkt. #68, Exhibit 143).

On October 8, 2011, Plaintiff reported that as a result of "the reductions in [his] medications…[his] tics and vocalizations are becoming more pronounced, frequent and violent." (Dkt. #59 at 660). On October 26, 2011, Plaintiff reported to Dr. Czop that he had recently experienced "six more seizures. . where I go into like a trance where I slump down and drool and [my] eyes water [and] I can't function [and] I can't control my movement [and] can't speak." (Dkt. #68, Exhibit 146). The doctor observed that Plaintiff "had impeccably trimmed nails and no cuts or scratches on his clean shaven face, unexpected for someone with uncontrolled tics." (Dkt. #57, Exhibit A at ¶ 39).

On October 28, 2011, following a discussion with Dr. Choi regarding Plaintiff's treatment, Dr. Czop concluded as follows:

> My conclusion after extensive review, study, and over two years of treating and observing is that the behaviors [Plaintiff] exhibits are exactly that, i.e. behaviors. I believe what he gains is "insulation" from surrounding threats by being "different" in this fashion. By the nature of the symptomatology, I feel comfortable that there is no suggestion of mass or electrical pathology in his brain. [Plaintiff] states that Neurontin

> plus Depakote have reduced his symptoms, and I believe he is correct in that, but the mechanism is probably more from sedation and anxiety reduction than from calming an epileptogenic foci in the brain. [Neurontin and Depakote] are not w/o significant risk. I believe that risk is greater than the risk of continuation of the behaviors in question. He may continue to derive whatever gain he derives from these behaviors without the threat of well-intentioned, but no longer indicated, pharmacologic therapy. No further study or additional input is indicated in my judgment at this time. The tapering and elimination of Neurontin and Depakote will proceed in safe medical fashion.

(Dkt. #68, Exhibit 147).

On January 10, 2012, Plaintiff was examined by Dr. Czop. (Dkt. #68, Exhibit 151). Plaintiff reported that since being taken off Neurontin, he was experiencing "grand mal seizure(s) with lying around with limbs flopping, and they are much more frequent." (Dkt. #68, Exhibit 151). Dr. Czop noted that Plaintiff's alleged seizures had not been witnessed by any staff member. (Dkt. #57, Exhibit A at ¶ 41). Later that day, Dr. Czop discussed Plaintiff's treatment with Dr. Pandya who concluded that Plaintiff "does have a seizure disorder and should be continued on Depakote." (Dkt. #68, Exhibit 152). Dr. Czop suggested that Plaintiff be examined by a neurologist, but Dr. Pandya disagreed on the ground that such was unnecessary. (Dkt. #68, Exhibit 154).

On January 16, 2012, Dr. Czop surreptitiously observed Plaintiff via "the control center video equipment for about 20 minutes." (Dkt. #59 at 8). Plaintiff exhibited "rare mild tic like jerks of his head, only one of which appeared to be associated with a vocalization or utterance." (Dkt. #59 at 8). Dr. Czop then exited the control center to speak with another prisoner who was sitting at the same table as Plaintiff. (Dkt. #59 at 8). Upon returning to the control center, a corrections officer informed Dr. Czop that "the frequency and severity of [Plaintiff's] tic-like head movements" increased while the doctor was speaking with the other prisoner. (Dkt. #59 at 8). Dr. Czop observed, however, that once he returned to the control center, Plaintiff's "movements returned to [his] pre-appearance baseline."

(Dkt. #59 at 8). Dr. Czop subsequently consulted with Dr. Pandya who instructed Dr. Czop to discontinue Plaintiff's Neurontin prescription. (Dkt. #59 at 9).

On February 4, 2012, Plaintiff reported to a nurse that he has been experiencing seizures "since the doctor took me off my meds." (Dkt. #68, Exhibit 156). The nurse observed, however, that Plaintiff had failed to report any of his alleged seizures to prison officials. (Dkt. #68, Exhibit 156). Two days later, Plaintiff was examined by Physicians Assistant Kennerly. (Dkt. #68, Exhibit 157). Kennerly observed that Plaintiff was exhibiting a "meowing" tic, but that such was "no different tha[n] what I have observed in the past." (Dkt. #68, Exhibit 157). Treatment notes dated February 13, 2012, indicate that Plaintiff's Depakote level was "therapeutic." (Dkt. #68, Exhibit 158). Dr. Czop again requested that Plaintiff participate in a three-day video EEG examination, but this request was denied on February 17, 2012. (Dkt. #59 at 33).

## ANALYSIS

**I.        Defendants Czop and Pandya**

Plaintiff alleges that the decision by Defendant Czop and Pandya to discontinue his Neurontin and Depakote prescriptions violated his Eighth Amendment rights.

Initially, the Court notes that Plaintiff's Depakote prescription was not discontinued as Plaintiff alleges. As detailed above, while Dr. Czop decided to discontinue Plaintiff's Depakote prescription, that decision was subsequently overruled by Dr. Pandya. Treatment notes dated February 13, 2012, indicate that Plaintiff's Depakote level was "therapeutic," indicating that Plaintiff's Depakote prescription was, in fact, continued.

As for the decision to discontinue Plaintiff's Neurontin prescription, the medical evidence, as well as the affidavits submitted by Defendants Czop and Pandya, make clear that Plaintiff was not denied treatment or medication. Rather, Dr. Czop and Dr. Pandya made a reasoned decision, in the exercise of their professional medical judgment, that Neurontin was not the appropriate medication to treat the symptoms Plaintiff was experiencing. At most, Plaintiff has demonstrated that he disagrees with Defendants' treatment decisions and, perhaps, that Defendants have committed malpractice. As previously discussed, however, neither disagreement with treatment decisions nor malpractice implicate the Eighth Amendment. Accordingly, the undersigned recommends that Plaintiff's motion for summary judgment be denied as to his claims against Defendants Czop and Pandya and that Defendant Czop's and Defendant Pandya's motions for summary judgment both be granted.

## II. Defendant Corizon

Plaintiff alleges that Corizon "enacted, implemented, and put into action a verbal or written policy, practice, custom, or procedure of denying or terminating needed medications to prisoners with chronic illnesses, including the Plaintiff, without any apparent medical justification and evidently for the purpose of saving costs, maximizing profits, or other non-medical reasons."

Corizon is not vicariously liable for the actions of its employees and, therefore, "may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (quoting *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 694 (1978)); *Street v. Corr. Corp. of America*, 102 F.3d 810, 818 (6th Cir. 1996); *Starcher v. Correctional Medical Systems, Inc.*, 7 Fed. Appx. 459, 465 (6th Cir., Mar. 26, 2001). To establish

liability against Corizon, Plaintiff must demonstrate that he suffered a violation of his federal rights "because of" a Corizon policy, practice, or custom. *See Thomas*, 398 F.3d at 429.

To establish the existence of a policy, practice, or custom, Plaintiff must demonstrate the following: (1) the existence of a "clear and persistent pattern" of illegal activity; (2) that Corizon had notice or constructive notice of such; (3) that Corizon tacitly approved of the illegal activity, such that "their deliberate indifference in their failure to act can be said to amount to an official policy of inaction" and (4) that the policy, practice, or custom in question was the "moving force" or "direct causal link" in the constitutional deprivation. *Id.* at 429 (quoting *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996)).

As the evidence detailed above reveals, the decision by Dr. Czop and Dr. Pandya to discontinue Plaintiff's Neurontin prescription was made in the exercise of their professional medical judgment. There is no indication in the voluminous medical record that Defendants' treatment decisions were in any way motivated by the cost of such or that Corizon has any sort of explicit or implicit policy to deny necessary or appropriate treatment on the basis of cost. In discovery responses, Corizon asserted that its policy is that treatment decisions are "left to the professional judgment of the medical providers overseeing a patient's care." (Dkt. #57, Exhibit C). Corizon further asserted that it "is not responsible for or involved in the stocking or provision of medication to the inmates at the MDOC." (Dkt. #57, Exhibit C). Plaintiff has presented no evidence to the contrary. Plaintiff has presented no evidence which, even if believed, would entitle him to relief on this claim. Accordingly, the undersigned recommends that Plaintiff's motion for summary judgment be denied as to his claims against Defendants Corizon and Prison Health Services and that summary judgment instead be granted to Defendants Corizon and Prison Health Services.

## **CONCLUSION**

For the reasons articulated herein, the undersigned recommends that <u>Defendants Corizon Health and Richard Czop's Motion for Summary Judgment</u>, (dkt. #57), be **granted**; <u>Defendant Pandya's Motion for Summary Judgment</u>, (dkt. #60), be **granted**; <u>Plaintiff's Motion for Summary Judgment</u>, (dkt. #67), be **denied**; and this action **terminated**. The undersigned further recommends that appeal of this matter would not be taken in good faith. *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997); 28 U.S.C. § 1915(a)(3).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice. 28 U.S.C. § 636(b)(1)(C). Failure to file objections within the specified time waives the right to appeal the District Court's order. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: November 27, 2013  /s/ Ellen S. Carmody
ELLEN S. CARMODY
United States Magistrate Judge